UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------x

Linda GARONE,

               Plaintiff,

        -against-                       <u>MEMORANDUM AND ORDER</u>
                                                   00 - CV - 6722 (ILG)

UNITED PARCEL SERVICE, INC., Stan
SCIGOWSKI, and Thomas DULLAHAN,

               Defendants.

-------------------------------------------------x

GLASSER, United States Senior District Judge:

## **INTRODUCTION**

     Linda Sardina[1] ("Plaintiff"), formerly an employee of United Parcel Service, Inc. ("UPS" or "Defendant"), brings Title VII, NYSHRL, and NYCHRL claims against UPS, Stan Scigowski and Thomas Dullahan (collectively "Defendants") for creating a hostile work environment and retaliating against her when she complained about sexual harassment. Before the Court is Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56.

## **FACTS**

### I.    **Plaintiff's Work Assignments at UPS**

     In November 1993, UPS hired Sardina as a part-time "tracing clerk." (56.1 ¶3). She worked at UPS's Foster Avenue Facility in Brooklyn which was organized into five

---

    [1] In the time since this action was filed Linda Garone changed her name to Linda Sardina, and is referred to thus throughout.

"centers": Times Plaza, Kensington, Canarsie, Marine Park and Fort Hamilton, each of which served a specific geographic area. (56.1 ¶ 3; Scigowski Tr. 12). Each of the centers had a center manager. The center manager in turn reported to the division manager, who was responsible for the entire Foster Avenue facility. (56.1 ¶ 4). The division manager until January 1999 was Bruce Pace. In January 1999, Cindy Miller replaced Pace. (56.1 ¶ 4).

In 1996 Sardina was assigned to the Kensington Center, where Bill Burgess was the center manager. (Pl. Tr. 26). Upon Sardina's request, Burgess arranged for her transfer to the Times Plaza center,[2] where in January 1997 she was promoted to a full-time position as an operations management specialist ("OMS"). (Pl. Tr. 68-69, 56.1 ¶3). The full-time OMS monitors the interaction of drivers and customers by dispatching on-call air packages, answering complaints from customers, and supervising the part-time OMSs in the center. (56.1 ¶ 3). Stan Scigowski became the Times Plaza center manager in April 1997. (56.1 ¶ 4). And among Sardina's co-workers at the Times Plaza center was Thomas Dullahan, who became an "on-car supervisor" in the fall of 1997. (Pl. Tr. 262). The on-car supervisors supervised the drivers and reported directly to the center manager. (56.1 ¶ 5) Sardina worked as a full-time OMS in the Times Plaza center until October 1998. (Id.). In October 1998, she complained to Pace that she was unhappy at the Times Plaza center. Pace reassigned her to the Kensington center. (Pl. Tr. 55-58, 123, 280-81). After reporting to the Kensington Center for one day, however, she

---

[2] It is undisputed that Sardina and Burgess privately had a "welcome and consensual" intimate relationship between 1996 and 1998, which Sardina does not allege constituted harassment. (See Pl. Tr. 67, 92, 353; Burgess Tr. 55-56, Def. Mem. at 6 n.3.). The transfer she requested in 1996 was after she and Burgess broke up for the first time, because they thought "it would be too hard for [them] to work together." (Pl. Tr. 64-69). They subsequently continued their relationship.

suffered an emotional breakdown and left work on short term disability. (Id.).  Sardina had been receiving psychological and psychiatric treatment since 1996, when she had endured a traumatic divorce from an abusive husband. (Pl. Tr 49-58).  She acknowledges that in the months leading up to her October 1998 emotional breakdown she had been regularly abusing prescription anti-depressants.  (Pl. Tr. 49-58).

In January 1999, Sardina returned to work against her doctor's advice.  (Pl. Tr. 344).  She was assigned to the Canarsie center.  (56.1 ¶ 22, Pl. Tr. 344).  In February 1999, Andy Schwartz became the Canarsie center manager.  (Pl. Tr. 344; 347-48).  Sardina worked in the Canarsie center for four months, through April 1999, before she suffered another emotional breakdown.  She has subsequently been unable to return to work.  (Pl. Tr. 207-210, 217-19, 448, 453-54).

## II. Plaintiff's Allegations of Harassment at the Times Plaza Center

### A. Allegations of supervisory harassment

Sardina alleges that the onset of the hostile work environment correlates to Scigowski's arrival as her supervisor and Times Plaza center manager in April 1997.  (Pl. Tr. 101).  When Scigowski arrived, Sardina had been the full-time OMS at Times Plaza center for three months, during which time there had been two center managers.  Under the previous managers, Sardina contends she was given "full reign" in their absence.  (Pl. Tr. 104-05).  Scigowski, however, exercised tighter control over the office and did not grant her the same authority to supervise employees, schedule employee time off or enforce customer requests for drivers to pick-up packages.  (Id. 101-105).  Sardina characterized Scigowski's management style as "[h]is way or the highway" not only with her, but also with others who reported to him. (Id. 271).

Sardina alleges Scigowski made certain harassing comments. The first of these comments was Scigowski's use of the term "office bitch." Sardina testified as follows:

A:   I was in the computer room by myself. Stan [Scigowski] had given two of the girls off that day. So that left me two people down. So I called Stan from his office, and Mike came out with him, and I said to him, I need help in here. So he turned to Mike Kellerher and he said, come on, Mike, sit down, learn how to be an office bitch.
Q:   Did Mr. Kellerher say anything?
A:   He was like – turned red.
Q:   And what, if anything, did you say to Mr. Scigowski?
A:   I said, are you calling me an office bitch? And he goes, oh, not you, LG. I said, well, then who Stan, the rest of the OMS's in the building? I said, you know, Stan, you're really pushing your luck with me. And Michael just turned around and walked out shaking his head like this.
Q:   Do you think that Mr. Scigowski understood that you did not appreciate those words?
A:   Yes, he understood I didn't appreciate it.
Q:   Did he ever say it again in front of you?
A:   No, not in front of me.
Q:   Did anyone ever tell you that he used that expression again?
A:   No.

(Pl. Tr. 273-74).[3]

Sardina next objected to Scigowski's use of the term "Brooklyn bimbettes" to refer to her and one other woman who worked in the center. Sardina testified thus:

Q:   Tell me about the occasion when Mr. Scigowski called you a Brooklyn bimbette?
A:   He didn't call me a Brooklyn bimbette. He referred to myself and [another woman] as those two Brooklyn bimbettes, and not to my face.
Q:   How did you become aware that he made this statement?
A:   Bill told me. Bill Burgess told me that in a meeting down in Bruce's office that Stan had stated that in front of all the center managers.

---

[3]   Scigowski acknowledges that he used the term "office bitch," but denies that it was used to refer to Sardina. He testified that "[i]t's a joking term that [he and the on-car supervisors] use . . . Somebody gets to be the road warrior, somebody gets to be the OB. All that means is that they stay in the office and do what I tell them, whether it's to do paperwork, you know, do reports for me, whatever the case may be." (Scigowski Tr. 47).

> And they thought it was a big joke, you know, they were all laughing. And I got annoyed.
>
> And then sometime after that I was walking into the Times Plaza Center and he was in his office, Stan, talking to someone, the door was half ajar, and I overheard him make that comment again, the two Brooklyn bimbettes out there are giving me a hard time.

Q:    Do you know who he was speaking to?

A:    No.

Q:    Did Mr. Scigowski ever call you that to your face?

A:    No.

                                    * * *

Q:    Did you ever overhear Mr. Scigowski use that expression other than the time that you've already told us about?

A:    No.

Q:    Did you ever become aware of Mr. Scigowski using the Brooklyn bimbette expression again?

A:    No . . .

(Pl. Tr. 262-63, 264-65).

Sardina also objected to Scigowski's use, on one occasion, of the term "cat fight." Sardina attempted to discipline a female employee who reported to her. The woman called Sardina a "goddamn Sicilian." Scigowski, who was present, allegedly told the two women not to have a "cat fight." (Pl. Tr. 94-95, 125, 356).

In addition to the allegedly harassing comments, Sardina also points to two disagreements she had with Scigowski over managerial decisions. First, during the summer of 1997 the UPS drivers went on strike. (Pl. Tr. 410). In response, UPS ordered certain management employees to make deliveries. (Scigowski Tr. 42). As an OMS, Sardina was not asked to go out on delivery routes, but to remain in the office and continue to perform her duties.[4] (Scigowski Tr. 42-3). Sardina, though she

---

[4] Plaintiff's counsel acknowledged at argument that it was UPS policy for all OMSs, men and women alike, to remain in the building and perform their duties during the strike. Nonetheless, Plaintiff contends that the initial failure to allow her to make deliveries constituted harassment.

acknowledges that she "was not trained" to make deliveries, (Pl. Tr. 410), nonetheless wanted "to go out and deliver and be part of the team just like everybody else." (Pl. Tr. 411). Sardina acknowledges that she was ultimately allowed to go out on a delivery run, but only after she accused Scigowski of being a "chauvinist." (Pl. Tr. 93-4).

Scigowski recalled that a few exceptions were made to the UPS policy that OMSs were to remain in the office; certain OMSs, including Sardina, were allowed to experience making deliveries. (Scigowski Tr. 41-2). He testified:

> Q:   [H]ow is it that eventually Ms. Garone did actually go out on deliveries during the strike?
> A:   She asked.
> Q:   She asked you?
> A:   She asked – I believe it was me and I had some conversation with Bruce [Pace], because I know there was one other OMS in the building that we did let go out for the day just because they wanted to know what the experience of delivering the package was.
>
> They had to go with somebody, because they had to be DOT qualified, and that was part of the problem also with who can go out and who couldn't. If you don't have a DOT card, you can't pass the physical, you can't drive the package cars. Anybody who did not fit that criteria had to go out as a passenger. We had a lot more passengers than drivers.
> Q:   Is that the capacity that Ms. Garone went out, she went out as a passenger?
> A:   Yes.
> Q:   There was one other full-time OMS that also went out as a passenger during the strike?
> A:   Yes.
> Q:   Who was that person?
> A:   I believe it was Forestein (phonetic). I think her last name is Alexander.

(Scigowski Tr. 43-44).

Next, Sardina alleges that Scigowski harassed her by excluding her from daily meetings with his supervisors to which she believed she should have been invited. The

meetings were typically held at 6:00 am, when the supervisors started their day; but

Sardina was not required to be at the office before 9:00 am. (Pl. Tr. 442-43). She

testified as follows:

> A: . . . Now, it's the business manager's responsibility to make sure
> that his OMS has the knowledge to be able to do this job, but he
> never shared any of this with me. In the morning meetings with his
> supervisors I was supposed to be in those meetings because as the
> day would go on if I didn't know how many – what drivers had how
> many pickups or what drivers had how many stops, I didn't know
> who would be available to send here, there. It was like a clueless
> thing. He did not let me in on anything . . .
> * * *
> Q: At lunch did he reply to your comment that you ought to be in the
> morning meetings? Did he say he'd have you come or that for some
> reason he thought you shouldn't come?
> A: Oh, if you want to be there, LG. Not you should be there.
> ***
> Q: . . . [D]id you begin to attend the morning meetings?
> A: No.
> Q: Why not?
> A: I just – I wasn't asked to go in.

(Pl. Tr. 268-271).

## B. Allegations of harassment by Dullahan and other co-workers

In addition to her allegations against Scigowski, Sardina alleges she was harassed

by her co-workers at the Times Plaza center. Specifically, she alleges that Mike

Dullahan made numerous sexual jokes and comments. He often joked about her

needing to get laid, needing a man, or "PMSing." (Pl. Tr. 298-302). On one occasion, he

called her from another office and asked her if she was wearing pants or a skirt, saying

that she should wear a skirt and show off her legs; and on other occasions he would look

under desks to see if the women in the office were wearing skirts or pants. (Pl. Tr. 302-

03). Sardina also stated that Dullahan would generally challenge her authority and

mock her when she would check on the status of deliveries, and that he acted similarly towards other women.  (Id. 291-93, 303).

Sardina alleges other jokes, comments, and conduct of a sexual nature that she believes constituted harassment.  On one occasion, Larry Bubla, a manager who didn't work in Sardina's center but "came in and out" of the office, allegedly showed individuals in the office pictures of his vacation, including several pictures of his girlfriend naked.  (Pl. Tr. 125; Pl. Aff. 46).  Another time, Frank Landau, an on-car supervisor, allegedly asked Sardina to participate in a threesome with him and his wife.  (Pl. Tr. 95, 124).  And during the UPS strike, when Sardina was assigned to make deliveries with her friend Tom McNamara, McNamara allegedly grabbed her buttocks, causing her to experience "huge black and blue marks."  (Id. 282-83).  Even after that incident, however, Sardina considered McNamara a friend. (Id. 286).

Notwithstanding her discomfort with the allegedly harassing jokes, comments, and behavior, Sardina acknowledges that she discussed her personal life openly in the office, and acknowledges that she made sexual jokes along with others in the workplace:

> Q:     Did you talk about your personal life . . . in the workplace in front of
>          other people in the office?
> A:     Yeah, I probably did.
> Q:     Did you ever in a joking fashion or otherwise ask people about their
>          romantic lives or sexual lives?
> A:     Yeah, probably.

(Pl. Tr. 308).

> Q:     While you were at UPS, did you ever make any comments to anyone
>          about Viagra?
> A:     Yes.
> Q:     What did you say?
> A:     Tommy Dullahan said – had made a comment he had to go out and
>          get Viagra and go home to his wife, so I said to him hey, Tommy,

8

you need Viagra?  I said, come on over to my house, you won't need any Viagra.

Q:     What if anything did he say?

A:     He turned red as a beet.  And I said, what's the matter Tommy, you can dish it out but you can't take it?

Q:     Did he say anything to that?

A:     No, didn't say anything, just walked out embarrassed.

(Pl. Tr. 404-5).

Finally, Sardina has identified other events that she believes evidenced a hostile work environment.  First, a female co-worker called her a "guinea." (Pl. Tr. 96).  And on two occasions, she was ordered by Scigowski to document remarks made by others that she had observed.  She was told to sign a statement documenting a conversation she was present for in which a woman had referred to one of the managers as a "fucking bastard." (Pl. Tr. 390-91).  And she was told to document that a driver had transmitted a message back to the office, the content of which was, in essence, "Mustafa and I will come back to the building and get all you whites." (Pl. Tr. 394).

### C.    Sardina's failure to complain while working at the Times Plaza Center

For nearly eighteen months after Sardina alleges the sexual harassment began at the Times Plaza center, she never lodged a complaint about Scigowski's behavior or the conduct of her co-workers to any manager or human resources personnel who could take action upon the complaint.

The first time that she complained about a pattern of mistreatment at the Times Plaza center was in October 1998 when she met with Bruce Pace, the division manager.  At that meeting, Sardina recalls telling Pace that she "didn't like the way [she] was being treated in Times Plaza. [She] told him about the Brooklyn bimbette, the office bitch.

The way Stan [Scigowski] treated [her].  The remarks by Dullahan. [And t]he Irene Reda ["cat fight"] remark." (Pl. Tr. 278-79).  Pace recalls that:

> A:  [S]he told me what had happened in the office, she told me that she was upset about it.  I asked her if she wanted to file a formal complaint against Stan in [sic] the center team.  She had told me she didn't want to get anybody in trouble, and so I asked her what she felt that would rectify the situation, and she asked me to move her to the Kensington Center.

(Pace Tr. 21).  Sardina acknowledges that she told Pace that she was "not looking for a lawsuit" and that she accepted the transfer because she "just at that point didn't want to be in Times Plaza." (Pl. Tr. 279-80).

Pace gave Sardina a week off in between assignments and told her that he would meet with Scigowski and other members of the Times Plaza team to "tell [them] that any kind of profanity in the office, in the workplace, is unacceptable, and if they continue to use it, they would not work at UPS." (Pace Tr. 23-25).  After meeting with Sardina, Pace met that afternoon with Scigowski to review the allegations.  (Id. 24-25).  He did not identify Sardina by name, but "made a general statement to [Scigowski], because of the confidentiality of the matter."  (Id. at 32).  Scigowski said that he would "talk to all the drivers and explain to them that they needed to curtail their language around the offices."  (Id.).

Sardina contends that prior to complaining to Pace in October 1998, she had discussions with her paramour, Kensington center manager Bill Burgess, about inappropriate behavior at the Times Plaza center.  Specifically, Sardina stated Burgess told her he had overheard Scigowski use the "Brooklyn bimbette" appellation in reference to her, and that in response to her complaints to Burgess in September 1998, it

was Burgess who encouraged her to meet with Pace.  (Pl. Tr. 262, 83).  Sardina did not

expect Burgess to act in a managerial capacity upon their confidences, however:

> Q:      Would you have been surprised if Bill had spoken to Stan about [the
>         Brooklyn bimbette] comment?
> A:      Well, I understood why he couldn't speak to him about it.  I didn't
>         ask him to speak to him about it because I felt that, you know, I
>         didn't, you know – who would want to make – you know, why
>         would he be sticking up for me, so I didn't ask him to do that.  I
>         never asked him to, you know, go out of his way for me.  I, you
>         know, just didn't.

(Pl. Tr. 264).

Similarly, Sardina contends that she complained to McNamara, who was the

Marine Park center manager before he left UPS in February 1998. (Pl. Tr. 281).  Though

they never had a romantic relationship, it is undisputed that Sardina and McNamara

were friends when McNamara worked for UPS; and their friendship continued after he

left the company in February 1998. (Id. 282, McNamara Tr. 26).  Sardina specifically

identifies one occasion on which she met McNamara at a restaurant in either August or

September of 1998, nearly six months after he had left UPS.  (Pl. Tr. 178-180).  Though

McNamara did not specifically recall the contents of her complaints that evening, he did

recall that Sardina had previously complained to him "along the lines [that Scigowski]

was not capable or professional in his duties, and it affected the way that she was asked

to perform her job."  (McNamara Tr. 19, 26).  Sardina, for her part, characterized her

complaints at dinner that evening as "just venting to him, you know, about some things

that were going on, and, you know, how Stan was still treating me, and the fact that, you

know, it was – it wasn't – it was bad enough that he referred to the women or myself as

a Brooklyn bimbette, an office bitch, but that that's the way he treated me."  (Pl. Tr. 179).

## III.  Allegations of Harassment and Retaliation at the Canarsie center

Sardina returned to work against her doctor's orders in January 1999 and was assigned to the Canarsie center, where she alleges that she encountered additional harassment and retaliation for complaining about the harassment.  (Pl. Tr. 85, 344). She worked at the Canarsie center for approximately four months before suffering her second emotional breakdown on April 29, 1999, after which she has been unable to return to work. (56.1 ¶ 29).

### A.  Allegations of supervisory harassment and retaliation

Andy Schwartz became the center manager at the Canarsie Center in February 1999.  Sardina asserts that prior to returning to work, Pace had approved a reduced work schedule for her. (Pl. Tr. 343-44).  Her understanding of the agreement "was that they were to be four to five hours a day until [her] doctor O.K.'d the going back to full-time work." (Pl. Tr. 383).[5]  Despite the fact that there is no evidence that Schwartz ever knew of Sardina's October 1998 complaint to Pace about the Times Plaza behavior, (Pl. Tr. 112-114), Sardina alleges Schwartz's failure to honor the reduced work schedule constituted retaliation for her complaints.  She contends that the schedule was honored "for the most part" through February, (Pl. Tr. 382), but that eventually Schwartz refused to accommodate the schedule or accept her doctor's notes.  Sardina testified that:

> I told [Schwartz] that Bruce [Pace] and I had had a meeting and I was supposed to be working only five hours a day.  On one occasion he told me on the phone that I better get with the program and get it back together again real soon.

---

[5]  Pace disputes Sardina's account; his recollection was that "we were going to keep her right at eight hours.  Some days they would work over eight hours, the full-time OMS's.  We were going to keep her right at eight hours." (Pace Tr. 41).

(Pl. Tr. 385).[6]

Sardina also alleges that Schwartz patronized her, made fun of her, and encouraged her co-workers to do so as well.  For example, Sardina alleges that she was harassed when Schwartz, who knew that her son's nickname was "Moose," brought a cake into the office in the shape of a moose.  (Pl. Tr. 98).  On another occasion, Sardina believes that Schwartz conspired with other employees to suggest that she had tried to poison his coffee:

> Q:     The entry [in your diary] on February 26th, which says "The coffee harassment," what does that mean?
> A:     Well, I was going out to Dunkin' Donuts and Demarco and Schwartz asked me to get them a cup of coffee while I was out, so I did.  And after he drank the coffee he started complaining that he felt sick, he felt sick, he had pains in his stomach.  And so I thought  − I knew why he was doing it, because I had this thing about someone trying to put something in my coffee.  And I had told Billy [Burgess] about that.[7]  And so Billy knowing me, like you know, knowing me, knowing the way I am and how I think, I took that to heart thinking, oh, now he's going to say that I tried to poison him.
> (Pl. Tr. 233-34).[8]

_____

[6] Schwartz acknowledged that Garone was working reduced hours.  He testified that soon after he became center manager:

    A:     . . . I had a conversation with Ms. Garone as she brought it to my attention being new in the center that she had special considerations that had to be made, because she was going to doctor visits in the p.m.  And at that point in time, she wasn't capable of working a full-time stretch of hours, which I complied to.

(Schwartz Tr. 16).  He denies, however, that he was ever informed of the reduced work schedule by his supervisor, Miller.  He stated that he took Garone's word "at face value."  (Id. 17).

[7] Sardina had told Burgess and at least one other co-worker that she had a fear of having her food or drink poisoned. (Pl. Tr. 237).

[8] Sardina discussed this incident and her fear of poisoning with her doctors, and acknowledged that her concerns may have been misguided:

    Q:     Did you share this coffee incident concerning Andy Schwartz with any of your health care providers?
    A:     Yes.
    [ . . . ]
    Q:     Do you remember what, if anything, [your doctor] said when you shared this with him?

Finally, Schwartz allegedly harassed Sardina by reprimanding her for actions that weren't her fault. For example, Sardina had a problem with one of the part-time OMSs who allegedly misplaced reports. According to Sardina, "every night before I left, I would instruct him where the reports had to be, had to go, and the next day they would never be there. He would mock me. He would repeat what I said over and over and over and over again in a mocking way." (Pl. Tr. 428). Sardina told Schwartz that she was having difficulty getting this individual to properly file the reports. According to Sardina, however, Schwartz never disciplined the individual but "would just yell and scream" that Sardina was "responsible for getting [the part time OMSs] to do the things they're supposed to." (Pl. Tr. 429).

## B. Allegations of harassment and retaliation by coworkers

Sardina identified two incidents which she alleges constituted sexual harassment by co-workers at the Canarsie center. First, in response to Sardina's refusal to give him her phone number for an employee directory, one individual told her he'd "just get it off the bathroom wall." (Pl. Tr. 96-97). When she reported the incident to Schwartz, Sardina recalls that "he laughed in [her] face." (Id. 97). She told Schwartz she wanted

---

A:      No. We discussed how ridiculous it was. And I said, you're right, I know it was – I know.
Q:      I'm sorry. You know what was ridiculous?
A:      That, you know, it was something I conjured up.
Q:      What was?
A:      The poisoned coffee ,
[. . .]
Q:      . . . [D]id you tell any of your health care providers about the incident where you thought Schwartz would accuse you of poisoning his coffee?
A:      Yes.
[ . . . ]
Q:      And what did [your doctor] tell you about that incident?
A:      I'm sure – I don't remember it because I go there every week, but I am sure that he told me you're off in the wrong direction.
(Pl. Tr. 238-40).

an apology, and Schwartz reportedly told her that he couldn't make the co-worker do anything that he didn't want to do.  (Id.).  When Sardina "kept pushing for [the apology], two weeks later [the co-worker] apologized to [her] with a big grin on his face and then burst out laughing." (Id.).  Next, she alleges that on several occasions, though fewer than a dozen times, another co-worker joked about going home to beat up his wife.  Though she acknowledged that he made the comments as a joke and that perhaps "the other OMS's didn't take it as upsettingly as [she] did," because of her history of domestic abuse, Sardina told the individual that the comments upset her.  (Id. 401-04).  That same individual allegedly made a comment to the effect of "I better watch what I say or you'll start complaining of sexual harassment." (Pl. Tr. 357).

Along with those specific incidents, Sardina alleges that her coworkers generally patronized her, mocked her by repeating things she said, shunned her, and ignored her assignments, (Pl. Tr. 98, 100, 116, 187, 430).  When asked for examples, Sardina testified as follows:

> Q:    You testified a little bit earlier that your colleagues patronized you. What did you mean by that?
> A:    Everything that I would say they would repeat over and over and over and over again throughout the day.
> Q:    Give me an example.
> A:    Okay.  I said one day, I'm tired, meaning emotionally, mentally tired.  And after I said that, everyone would come in the office and go, I'm tired – acting, okay, not say, I'm tired, or Linda, I'm tired. Acting it out, I'm tired, throwing themselves on the desk, throwing themselves in the chair.  And it would be one right after the other; one would leave, one would come in one would come in, one would leave.  It would go on all day long.  All day long.

(Pl. Tr. 201-02).  Sardina provided no basis for inferring that her co-workers were either retaliating against her or harassing her because of her gender.  As an example, when

asked about the OMS that allegedly harassed her by intentionally misfiling reports, she

testified as follows:

> Q: Why do you believe that [he] was harassing you?
> A: Because him and Bill Burgess were very good friends.
> Q: And why would that make him want to harass you?
> A: I can't answer that question.
> Q: Do you have any facts that would cause you to believe that [he] was harassing you because of your gender?
> A: No I don't.

(Pl. Tr. 434-35). When asked, "[W]hat makes you think that that treatment [by your

coworkers] was motivated by a desire to retaliate against you because you made a

complaint to Bruce Pace?" Sardina replied that "[W]hen a complaint of sexual

harassment is placed and the person is shunned by their co-workers in any

environment, I don't have the answer as to why that is done to people." (Pl. Tr. 118).

### C.     Sardina's complaints about behavior at the Canarsie center

Sardina contends that she complained to Pace and Miller about retaliation and

harassment at the Canarsie center. Specifically, she points to two meetings she had, one

in February 1999, with both Pace and Miller, and one in March 1999, with only Miller.

Pace arranged the first meeting in February 1999 to introduce Miller, his

replacement, to Sardina. Sardina recollected this meeting as follows:

> Q: Tell me what got said at the meeting.
> A: I know we discussed my ex-husband and what had gone on.
> Q: By that you mean you told Cindy [Miller] you had the restraining order, that kind of thing?[9]
> A: Yes, yes. And honestly right now at this moment I can't really recall the meeting.

---

[9] Sardina and her ex-husband had obtained mutual restraining orders against each other during their 1996 separation, and had each other arrested pursuant to those restraining orders in the summer of 1996. (Pl. Tr. 34-35). It was after being released from jail for that arrest that Sardina first sought the assistance of a health care provider for her emotional condition. (Pl. Tr. 49).

Q:      Let me ask you this, do you recall whether you told Cindy that you were under the care of a doctor at that time?

A:      Yes, I'm sure I did.

Q:      And did you tell Cindy that you were on medication at that time?

A:      I don't recall if I told her.

Q:      Did you discuss your hours with her during that meeting?

A:      No, I don't believe we discussed the exact hours, no.

Q:      Did I understand you before to say that Bruce was letting her know that you were working a reduced schedule?

A:      Yes, I believe that to be true.

Q:      Did you tell her whether there were any current problems that you needed her to do anything about?

A:      Not at that point, no.

(Pl. Tr. 345-47).  Sardina's account of the meeting is corroborated by a memo to file recorded by Miller.  (Urena Decl., Ex. P ("Miller memo, February 99").

Sardina met with Miller again on March 17, 1999.  In a memo to file, Miller documented Sardina's concerns expressed at that meeting, including the repeated comment made by a co-worker about going home to beat his wife, the joke about her phone number on the men's room wall, and a final comment made by a co-worker that Sardina was "the kind of girl no one wants their son to bring home." (Urena Decl. Ex. G ("Miller memo, March 17, 1999")).  According to the memo, Miller "told Linda that [she] would investigate everything, review it with center teams and if anything further happened, she was to tell [her] immediately." (Id.).  Miller then documented that she:

> called a meeting with the Canarsie center team at once and had them assemble in [her] office.  Andy Schwarz, [and other co-workers who Sardina alleged had made offensive comments] gathered at my conference table and I questioned them on our policy concerning harassment and a hostile work environment . . . Everyone was well versed on our zero tolerance policy.  I asked them if they were aware of circumstances surrounding Linda and they all said they knew of her problems.  I told them of the driver's comments and [one of the supervisors] admitted that he was present as Linda had stated.  He further added that he recognized the inappropriateness of the comment and immediately took the driver into a nearby office.  He gave him a verbal warning on how unacceptable

> his comment was and the driver apologized.
> [. . .]
> Everyone pledged to me that they certainly understood their individual
> responsibilities pertaining to keeping the work environment free of sexual
> harassment.  I adjourned the meeting.

(Miller Memo, March 17, 1999).[10]  When asked whether she ever heard the repeated joke

by a co-worker about going home to beat his wife after this meeting, Sardina stated that

she "really [did]n't recall, but probably not." (Pl. Tr. 404).

Sardina testified that she could not recall whether at that March 17, 1999 meeting

she told Miller about Schwartz's alleged failure to honor her reduced work schedule, but

Miller's memo makes no mention of such a complaint.  (Pl. Tr. 384).  The only

complaint about hours that Sardina testified she was certain that she made was to Pace:

> A:     I told [Bruce] that I was not getting – I was not getting the four to
>        five hours, that I was being kept there longer than I was supposed to
>        be.
> Q:     When did you tell that to him?
> A:     In a meeting I had with just him in a office in the Foster Avenue
>        facility.
> Q:     This at the time when he was the manager?
> A:     No, he was not the manager any longer.
> Q:     Cindy was already the manager?
> A:     Cindy was the manager.
> Q:     So why did you tell Bruce?
> A:     Because at the time I thought he was a confidant to me and I had
>        arranged the hour, I had made these arrangements with Bruce.
> Q:     But he set up a meeting with Cindy when Cindy took over so Cindy
>        would know the arrangement that he had made to you, you've
>        already testified to that, right?
> A:     Yes.

(Pl. Tr. 381-82).  Sardina gave no explanation for why she didn't talk to Miller.

---

[10]  The events of this meeting were corroborated by the deposition testimony of Schwartz,
(Schwartz Tr. 38) and a memo to Miller written by DiMarco, (Urena Ex. C).

**IV.    UPS's Anti-Discrimination Policies, Investigation of Sardina's Complaints and Termination of Sardina**

**A.    UPS's anti-discrimination policies**

At all times relevant to this case, UPS has had a policy against sexual harassment. (Owen Tr. 10-14; Owen Aff. ¶ 8, Ex A.).  The policy prohibits "sexual advances, requests for sexual favors, and other verbal or physical conduct . . . when an individual is implicitly or explicitly required to submit to such conduct as a condition of his or her employment, or where submission to or rejection of such conduct is used as a basis for an employment decision affecting the employee." (Owen Aff., Ex. C. "Code of Business Conduct," 19-20). It is UPS policy to post its sexual harassment policy at every facility and publish it in employee handbooks distributed to all UPS supervisors and managers, who are trained regarding the Company's anti-harassment policy.  (Id. ¶¶ 8-9, 18, Exs. B-D; Scigowski Tr. 8-9; Dullahan Tr. 35-36, 38).

UPS has enacted procedures for reporting allegations of harassment, and a policy of investigating and following-up on alleged incidents.  (See Code of Business Conduct, 32-33).  That policy clearly states that anyone reporting such an incident "will not be disciplined, lose [her] job, or be retaliated against in any other way for asking questions or voicing concerns about [the policy]." (Id.) UPS provides employees with multiple avenues for reporting incidents of sexual harassment, including an anonymous hotline for employees who "believe that [they] cannot go to someone in the traditional chain of command." (Id.; Owen Aff. ¶¶ 10-11). Complaints can also be brought to an employee's supervisor or manager, the Human Resources department, or can be lodged anonymously on a national "800" hotline created to process complaints of illegal or

19

unethical workplace conduct.  (Code of Business Conduct, 32-33; Owen Tr. 138-40).

### E.  Sardina's Termination and UPS's Investigation

On April 29, 1999, her last day of work at UPS, Sardina had an emotionally difficult confrontation in the UPS parking lot with a friend and co-worker whom Sardina believed was betraying her confidences.  (Pl. Tr. 218-219, 454).  At the end of that incident, Sardina collapsed and suffered a second emotional breakdown, rendering her unable to return to work.  (Id.).  Sardina had continuously been under medical supervision since October 1998 for paranoia and clinical depression.  (Pl Tr. 52-55, 135-37, 189-91, 446-47).  She had received psychological and psychiatric care dating back to the 1996 break-up of her abusive marriage.  She applied for and was granted disability benefits under UPS's benefits policies.  (Pl. Tr. 368-69; Owen Aff. ¶ 16).

During July 1999, while on disability leave, Sardina retained an attorney who wrote to Miller that Sardina had been harassed.  (Owen Tr. 18).  Miller referred the letter to District Human Resources Manager Craig Owen, who advised Sardina's attorney of UPS's employee dispute resolution program.  (Owen Tr. 19).  Pursuant to that program, Sardina met with Miller on July 28, 1999.  (Pl. Tr. 349-50).  She reiterated the complaints that had been investigated and addressed in March 1999, and for the first time disclosed her intimate relationship with Burgess and alleged that he had been involved with her harassment between January and April 1999.  (Pl. Tr. 349-61; Owen Tr. 21).[11]

---

[11]  Sardina's theory as to how Burgess harassed her is not clear.  When asked about these new allegations of harassment, she testified:

Q:       What is it that you believe now that Bill Burgess did between January of 1999 and
            April of 1999 to harass you?

A:       I believe that he was aware that I had psychological problems, he knew what

Miller reported that meeting to Owen, who met with Sardina on August 9, 1999, and then interviewed many of the individuals identified by Sardina as involved with the harassment.  (Owen Tr. 26-43, 46-78, 84-86, Exs. 5, 6).  Owen was unable to corroborate Sardina's relationship with Burgess, but did determine that some of the individual incidents of harassing conduct Sardina alleged had been investigated, documented, and addressed.  (Owen Tr. 45-46, 106).  Recognizing that Sardina nonetheless felt uncomfortable returning to the Foster City facility, UPS offered her the option, if she were medically able to return to work, of transferring to a facility located in Queens.  (Pl. Tr. 377-78; Owen Tr. 106-07).Pursuant to UPS's short-term and long-term benefit policies, Sardina continued to receive her full salary for a year following the commencement of her medical leave.  (Pl. Tr. 369-70; Owen Aff. ¶ 16).  As of April 29, 2000, Sardina's doctors still had not cleared her to return to work at UPS.  (Pl. Tr. 372; Owen Aff. ¶ 16).  Once Sardina's paid leave expired and she didn't return to work, she

---

those weaknesses were, and that he was also part of the whole harassment that was going on at the time. (Pl. Tr. 359)

[. . .]

Q:    I'd like, Ms. Sardina, for you to describe for the record what it is that Mr. Burgess did or said between January '99 and April of '99 that you believe was an act of sexual harassment.

A:    O.K., maybe the wrong word, maybe I used the wrong word of sexual harassment. It wasn't sexual harassment, just plain harassment. (Id.).

[. . .]

Q:    Why would Bill have any reason to harass you between January and April of 1999?  Why would Bill do that to you?

A:    Because I was dating a driver and he found out. (Pl. Tr. 361)

[. . .]

Q:    How do you know Bill knew that you were dating [this driver]?

A:    Just from that's my personal feeling.

Q:    He never said to you I know you're dating Jack?

A:    No, but I was told by Cosmo DiMarco that we take care of our own, do you understand what I'm telling you?  Maybe you don't understand what that means, but if you were working there we take care of our own means I wasn't sleeping with a management person.

Q:    We take care of our own means you weren't sleeping with a management person?

A:    That's right.

was administratively terminated by UPS.  (Pl. Tr. 372; Owen Aff. ¶ 16**)**.

## DISCUSSION

### I.      Summary Judgment Standards

Summary judgment under Fed. R. Civ. P. 56(c) is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Though "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor," <u>L.B. Foster Co. v. Am. Piles, Inc.</u>, 138 F.3d 81, 87 (2d Cir. 1998) (citing <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986)), the party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." <u>Scotto v. Almenas</u>, 143 F.3d 105, 114 (2d Cir. 1998).  Instead, the opposing party "must designate specific facts showing that there is a genuine issue for trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 3242 (1986).  A genuine factual issue exists if there is sufficient evidence favoring the opposing party for a jury to return a verdict in its favor. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 249, 106 S.Ct. 2505 (1986).

While it is "sometimes noted that an extra measure of caution is merited in [granting] summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions," <u>Holtz v. Rockefeller & Co., Inc.</u> 258 F.3d 62, 69 (citing <u>Gallo v. Prudential Residential Servs.</u>, 22 F.3d 1219, 1224 (2d Cir.1994)), "summary judgment remains available for the dismissal of discrimination claims in

cases lacking genuine issues of material fact." Id., citing McLee v. Chrysler Corp., 109

F.3d 130, 135 (2d Cir.1997). "It is now beyond cavil that summary judgment may be

appropriate even in the fact-intensive context of discrimination cases." Abdu-Brisson v.

Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir.2001).

## II.    Title VII Legal Standards

### A.    Hostile work environment standards

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment

practice for an employer . . . to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A

work environment becomes actionable under this provision when it is "permeated with

discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to

alter the conditions of the victim's employment," Harris v. Forklift Systems, Inc, 510

U.S. 17, 21 (1993) (citing Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65, 67, 106

S.Ct. 2399, 91 L.Ed.2d 49 (1986)).

The plaintiff must demonstrate both that she "subjectively perceive[d] the

environment to be abusive" and that the conduct alleged objectively created "an

environment that a reasonable person would find hostile or abusive." Harris, 510 U.S.

at 21. In assessing whether or not the plaintiff subjectively perceived the environment to

be abusive, the Court may consider whether she, "by her conduct, indicated that the

alleged [behavior was] unwelcome." Meritor, 477 U.S. at 68. The objective hostility of a

work environment can only be measured by looking at all of the circumstances,

including "the frequency of the discriminatory conduct; its severity; whether it is

23

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's psychological well-being." Harris, 510 U.S. at 23.

Because Title VII aims to eradicate discrimination on the basis of sex, not enact a "general civility code on the American workplace," Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 79, 118 S.Ct. 998 (1998). "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Faragher v. City of Boca Raton, 524 U.S. 775, 788 (citing 118 S.Ct. 2275 (1998). Moreover, while "a single incident of sufficient severity may so alter the terms and conditions of employment as to create such an environment," Patterson v. County of Oneida, N.Y., 375 F.3d 206, 227 (2d Cir.2004), such extreme incidents are the exception. Cf. Howley v. Town of Stratford, 217 F.3d 141 (2d. Cir.2000) (denying summary judgment where the employer failed to adequately respond to a single "tirade" by a co-worker in which he verbally assaulted the plaintiff in front of her subordinates, in sexual terms, where plaintiff was the only female in the presence of a number of men). "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" Alfano v. Costello, 294 F.3d 365, 374 (2d Cir.2002) (citing Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir.1997)). See also Carrero v. New York City Housing Authority, 890 F.2d 569, 577 (2d Cir.1989). Moreover, even where incidents are continuous and concerted, a pattern "only of verbal remarks," and marked by "the absence of sexually suggestive or offensive physical contact . . . might not rise to a Title VII violation." Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir.2001). In sum, a

plaintiff must show "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir.2000).

Finally, the plaintiff must also identify a specific basis for imputing the objectionable conduct to the employer. "[W]here the harassment is attributed not to non-supervisory co-workers but to a supervisor with immediate or successively higher authority over the employee . . . a court looks first to whether the supervisor's behavior 'culminate[d] in a tangible employment action' against the employee.'" Fairbrother v. Morrison, 412 F.3d 39, 49 (2d Cir.2005) (citing Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). Even in the absence of a tangible employment action, the employer will be held liable unless it successfully establishes the Faragher/Ellerth affirmative defense. See infra, Section II.D. However, "[w]here an employee is the victim of sexual harassment, including harassment in the form of a hostile work environment, by non-supervisory co-workers, an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action." Petrosino v. Bell Atlantic, 385 F.3d 210, 225 (2d Cir.2004).

### B.     Constructive discharge standards

"Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily. Working conditions are intolerable if they

are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Mack v. Otis Elevator Co., 326 F.3d 116, 128 (2d Cir.2003) (citing Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 73 (2d Cir.2000)). A plaintiff's claim for constructive discharge "requires the plaintiff to prove that her employer deliberately and discriminatingly created work conditions 'so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" Ferraro v. Kellwood Co.,440 F.3d 96, 101 (2d Cir.2006) (citing Pa. State Police v. Suders, 542 U.S. 129, 141, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004)). Where an employer immediately begins an investigation upon being made aware of employee's sexual harassment complaints, offers to transfer employee, and an employee simply refused transfer and failed to return to work, a constructive discharge has not occurred. See Mack, 326 F.3d at 128.

### C. Retaliation standards

To establish a prima facie case of retaliation, a plaintiff must demonstrate that "(1) she was engaged in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer." Mack, 326 F.3d 116, 129 (2d Cir.2003) (citing Gordon v. New York City Bd. of Educ., 232 F.3d 111, 116 (2d Cir.2000).

A plaintiff suffers an "adverse employment action" if she endures a "materially adverse change in the terms and conditions of employment." Richardson v. New York State Dep't of Correctional Serv., 180 F.3d 426, 446 (2d Cir.1999) (quoting Torres v.

Pisano, 116 F.3d 625, 640 (2d Cir.1997)). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir.2000) (quoting Crady v. Liberty Nat'l Bank and Trust Co. of Indiana, 993 F.2d 132, 136 (7th Cir.1993)). See also Yerdon v. Henry, 91 F.3d 370, 378 (2d Cir.1996) ("An adverse action is one that affects the terms, privileges, duration, or conditions of employment.") (quoting Johnson v. Frank, 828 F.Supp. 1143, 1153 (S.D.N.Y.1993)). Moreover, "unchecked retaliatory co-worker harassment, if sufficiently severe, may constitute adverse employment action so as to satisfy the second prong of the retaliation prima facie case." Richardson, 180 F.3d at 446. See also Ruggieri v. Harrington, 146 F.Supp.2d 202, 218 (E.D.N.Y.2001) (applying hostile work environment standards to determine whether alleged retaliatory action was "sufficiently severe").

**D.    The _Faragher/Ellerth_ affirmative defense**

A defendant may raise an affirmative defense to a charge of either hostile work environment discrimination or constructive discharge by showing that (a) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (b) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Burlington Indus., 524 U.S. at 765, 118 S.Ct. 2257. See also Ferraro, 440 F.3d at 101 ("Against employee claims of hostile  work  environment and constructive  discharge, the employer may have recourse to the so-called Faragher/Ellerth affirmative defense.").

27

"The existence of an anti-harassment policy with complaint procedures is an important consideration in determining whether the employer has satisfied the first prong of this defense." Leopold v. Baccarat, Inc., 239 F.3d 243, 245 (2d Cir.2001) (quoting Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 295 (2d Cir.1999)).

As to the second prong, because the primary purpose of Title VII "is not to provide redress but to avoid harm," Faragher, 524 U.S. at 2292, "where [a] plaintiff failed to take reasonable steps to avoid the harm he alleges, there is no basis for the imposition of vicarious liability." Barua v. Credit Lyonnais-U.S. Branches, 1998 WL 915892 at *5 (S.D.N.Y.1998). An eighteen month delay to report harassing conditions is unreasonable as a matter of law. Cf. Dayes v. Pace University, 2000 WL 307382, *5 (S.D.N.Y.2000) (holding that 12 month delay in reporting conditions was unreasonable as a matter of law), aff'd, 2 Fed.Appx. 204 (2d Cir.2001); O'Dell v. Trans World Entm't Corp., 153 F.Supp.2d 378, 391 (S.D.N.Y.2001) (holding that one year delay in reporting was unreasonable as a matter of law), aff'd 2002 U.S. 40 Fed.Appx. 628 (2d Cir.2002).

### III. Application of Title VII Standards

It is proper "to consult the case law when determining whether a rational factfinder could conclude that the plaintiff was subjected to a hostile work environment." Schiano v. Quality Payroll Systems, 445 F.3d 597, 606 (2d Cir.2006). Mindful of the Court of Appeals's caution to district courts not to determine questions of fact, repeatedly expressed in the pithy admonition that "[a]n Article III judge is not a hierophant of social graces," Gallagher v. Delaney, 139 F.3d 338, 347 (2d Cir.1998) (Weinstein, J.); See also, e.g., Schiano, 445 F.3d at 605; Holtz, 258 F.3d at 75; Ackerman v. National Financial Systems, 81 F.Supp.2d 434, 438 (E.D.N.Y.2000), a

court must nonetheless make a determination, based in part on similar cases which have been adjudicated, whether the party opposing summary judgment has provided sufficient evidence upon which a reasonable person could make a finding in its favor. This Court is no hierophant of social graces; but neither is the conduct described in this case an Eleusinian rite, nor must every song of Baubo go to a jury to find an insufficient basis for a harassment claim.[12]

A discussion of when the evidence adduced fails to support a rational finding of harassment is found in <u>Alfano v. Costello</u>, 294 F.3d 365, 379-380 (2d Cir.2002). There the Court of Appeals contrasted cases in which Courts of Appeal had held that the evidence could not sustain a finding of harassment:

> <u>Quinn v. Green Tree Credit Corp.</u>, 159 F.3d 759, 768 (2d Cir.1998) (an appreciative comment about plaintiff's buttocks and a deliberate touching of her breasts); <u>Celestine v. Petroleos de Venezuella SA</u>, 266 F.3d 343, 354 (5th Cir.2001) (in a twenty-five-month period, eight incidents of alleged racial harassment); <u>Shepherd v. Comptroller of Pub. Accounts</u>, 168 F.3d 871, 872-75 (5th Cir.1999) (in a two-year period, co-worker made impertinent and intimate observations about plaintiff's anatomy, attempted to look down her shirt, and touched her multiple times); <u>Black v. Zaring Homes, Inc.</u>, 104 F.3d 822, 823-24 (6th Cir.1997) (in a four-month period, repeated sexual jokes, and at least five other sexually offensive remarks); <u>Baskerville v. Culligan Int'l Co.</u>, 50 F.3d 428, 430-31 (7th Cir.1995) (in a seven-month period, nine sexually offensive incidents, including repeated references to plaintiff as a "pretty girl," grunting noises when she wore leather skirt, and one episode of simulated masturbation); <u>Hocevar v. Purdue Frederick Co.</u>, 223 F.3d 721, 735-36, 738 (8th Cir.2000) (in a three-year period, several sexually derogatory remarks about women by one or more men, a sexual advance at a company dance,

---

[12]  "Hierophant" has come to commonly mean "any interpreter of sacred mysteries or esoteric principles." <u>The Random House College Dictionary</u>, rev. ed. 1980. The original hierophants were high priests of the cult of Demeter and Persephone in ancient Greece, who performed annual secret initiation rites known as the Eleusinian Mysteries. Ironically, in the present context, these rites included the symbolic consummation of Demeter's love affair with Zeus by "working a phallic object up and down a woman's top-boot," and the comic relief of obscene songs sung in honor of Baubo, who according to legend, entertained Demeter with ribaldry as she mourned her daughter's death. <u>See</u> Graves, Robert, <u>The Greek Myths</u>, vol.1 §§ 24.c, 24.6, 24.9 (Penguin Books 1986).

disruption of plaintiff's presentation by talking followed by comment on her legs, and a lascivious remark in a group setting by a company official predicting his sexual conquest of three female employees); Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1365-66 (10th Cir.1997) (in a sixteen-month period, five sexually offensive statements, including one made while harasser had his arm around the plaintiff and was peering down her dress); Penry v. Fed. Home Loan Bank of Topeka, 155 F.3d 1257, 1261-63 (10th Cir.1998) (in a three-year period, harasser made remarks concerning plaintiff's bra strap, her underclothing, and whether she had sexual dreams; claimed sexual conquest of another woman employee; made pornographic architectural analogies; and took the plaintiff to a Hooter's restaurant on business travel (six total incidents)); Mendoza v. Borden, Inc., 195 F.3d 1238, 1248-49 (11th Cir.1999) (in an eleven-month period, harasser once made inappropriate physical contact, made one arguably offensive statement, and several times made disgusting noises while staring impertinently), cert. denied,529 U.S. 1068, 120 S.Ct. 1674, 146 L.Ed.2d 483 (2000); see also Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 753-54 (4th Cir.1996); Adusumilli v. City of Chicago, 164 F.3d 353, 361-62 (7th Cir.1998).

with cases in which a triable issue of fact was created by the evidence:

[I]n Raniola v. Bratton, 243 F.3d 610, 621 (2d Cir.2001), we saw a triable issue where the plaintiff demonstrated that, in "two and a half years time," she was subjected to "offensive sex-based remarks, disproportionately burdensome work assignments, workplace sabotage, and one serious public threat of physical harm." In Schwapp v. Town of Avon, 118 F.3d 106 (2d Cir.1997), we held that the plaintiff had created a triable issue of fact based on ten to twelve instances of explicitly racist conduct in twenty months, where most of the incidents involved racial jokes and epithets that insulted blacks, Puerto Ricans, and people of Middle Eastern origin. Id. at 112. In Cruz, we found a triable issue as to whether a workplace was both racially and sexually hostile where the plaintiff demonstrated that a supervisor "subjected her and others to blatant racial epithets on a regular if not constant basis,"202 F.3d at 571, made "repeated remarks" to the effect that women should not work, id., and physically harassed the plaintiff and other women by standing very close when he spoke to them, sometimes backing them into a wall and looking them "up and down in a way that's very uncomfortable," id. at 571-72 (noting that the racial harassment could have "exacerbated the effect of [the] sexually threatening behavior and vice versa"). See also Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 70, 75-76 (2d Cir.2001) (finding a triable issue where harasser touched plaintiff in unwelcome manner on a "daily basis," made "obscene leers at her," "tried to peer down her blouse and up her skirt," and made "approximately ten or twenty" insinuating remarks about her

sex life).

While the Court of Appeals in <u>Schiano</u> criticized the District Court for relying upon <u>Alfano</u> in its grant of summary judgment, <u>see</u> <u>Schiano</u>, 445 F.3d at 605 n.5,[13] pointing to a passage in <u>Alfano</u> where the Court noted that "[i]n a hostile work environment case, it may well be a proper exercise of the district court's broad discretion to allow the plaintiff to build her case partly by adducing incidents for which the link to any discriminatory motive may, in the first instance, appear tenuous or nonexistent." <u>Alfano</u>, 294 F.3d at 377, that passage in <u>Alfano</u> does not address whether the plaintiff adduced sufficient pre-trial evidence to survive summary judgment, but the propriety of "concluding that certain incidents must be excluded from consideration," by the jury. <u>Id.</u> Indeed, the Court in <u>Alfano</u> determined that evidence was insufficient to support a jury verdict of harassment and reversed the District Court's denial of defendant's Rule 50 motion.[14] Read in conjunction with the case law that unequivocally establishes that summary judgment may be appropriate in Title VII cases, <u>see</u>, <u>e.g.</u>, <u>Abdu-Brisson</u>, 239 F.3d at 466, <u>Alfano</u> clearly supports the granting of summary judgment where, as here, the allegations fall far short of sustaining a rational inference

---

[13] In <u>Schiano</u> the Court of Appeals reversed the District Court's grant of summary judgment for the defendants. In that case, the plaintiff alleged that the vice-president of the company put his hand on her thigh, pulling her skirt up a few inches, continuing to do so though she told him not to, and taking a picture of his hand on her leg. He suggested to her that if she wanted a raise she was "sleeping with the wrong employee," (she was dating a co-worker) and asked to come to her hotel room while they were traveling together. On multiple occasions, he approached her from behind while she worked at her desk, leaning into her and placing his hands on her back or neck. Plaintiff ultimately had a partition constructed around her cubicle to insulate her from the vice-president's behavior. When her weekly complaints to management about his behavior went unaddressed, she resigned.

[14] In <u>Alfano</u>, the plaintiff corrections officer presented evidence that she had been told not to eat certain foods, including ice cream, carrots, and bananas in a "seductive" manner, that carrots and potatoes were arranged in her mailbox to resemble male genitalia, that she received adverse employment reviews, and that other individuals made sexually suggestive comments in her presence. <u>Alfano</u>, 294 F.3d at 370-71.

of harassment, adverse employment action, or a constructive discharge. Moreover, in this case, the undisputed facts affirmatively establish UPS's defense to any claim.

### A. The alleged actions could not objectively be found to have constituted a hostile work environment.

Though the assumption would undoubtedly be challenged at trial based on, for example, Sardina's open discussion of her personal life in the workplace, use of sexual repartee with her coworkers, and equivocation on her belief as to the intentions of her alleged harassers, see Meritor, 477 U.S. at 68 (indicating that plaintiff's behavior may be considered in evaluating whether the conduct was unwelcome), the Court grants Sardina the benefit of the inference that she subjectively experienced the alleged conduct as sexual harassment.

But even assuming that she subjectively experienced the alleged conduct as harassment, the allegations, in their totality, are objectively insufficient to have altered the conditions of her employment. In this regard, application of the Harris factors and comparison to previous cases necessitates a conclusion that plaintiff's hostile work environment claim must fail.

The allegations against Scigowski are trivial. There is not a trace of either maliciousness, lewdness, or inequity in the way that he dealt with Sardina. His occasional–and discontinued– use of the generic terms "office bitch," "brooklyn bimbettes," and "cat fight" was neither severe, nor physically threatening, nor did it interfere with Sardina's job performance. Comments such as these, while bearing a connotation of sexuality, can only be questionably characterized as "mere offensive utterances." Moreover, as to her allegations that Scigowski treated her unfairly because

of her sex, the undisputed facts belie any such conclusion. To the contrary, when she asked to go out on deliveries during the strike, Scigowski and UPS accommodated her, despite the fact that she wasn't appropriately trained and her regular services were needed in the office. And when she expressed an interest in attending the supervisor meetings, Scigowski invited her to attend. The fact that he apparently had an authoritative management style that Sardina, for whatever reason, subjectively viewed as inappropriate does not transform the occasional off-color remark into harassment or strict managerial decision into chauvinism. Title VII simply does not concern itself with every blue or casually disparaging comment uttered in the workplace; nor does it prohibit every exercise of managerial discretion disapproved of by an employee who happens to be of a certain sex.

The behavior of Dullahan, certain other co-workers in the Times Plaza, and her co-workers at the Canarsie Center, while coarser than Scigowski's conduct, similarly fails to sustain an inference of harassment. In this respect, the allegations in <u>Shepherd</u>, 168 F.3d at 872, and <u>Penry</u>, 155 F.3d at 1260-61 are particularly apposite. In <u>Shepherd</u>, the allegations against the plaintiff's co-worker were as follows:

> According to [plaintiff] Shepherd's deposition, on one occasion [her co-worker] Moore stood in front of Shepherd's desk and remarked "your elbows are the same color as your nipples." Shepherd testified that Moore remarked once "you have big thighs" while he simulated looking under her dress. Shepherd claimed Moore stood over her desk on several occasions and attempted to look down her clothing. According to Shepherd, Moore touched her arm on several occasions, rubbing one of his hands from her shoulder down to her wrist while standing beside her. Shepherd alleged additionally that on two occasions, when Shepherd looked for a seat after coming in late to an office meeting, Moore patted his lap and remarked "here's your seat." Shepherd testified that Moore never propositioned her, asked her out on a date, or suggested that he would like to sleep with her. The touching stopped when Moore was reassigned to a different agency.

> Shepherd affirmed that, apart from the above instances, she engaged in
> friendly discussions with Moore on almost a daily basis and had a friendly
> relation with him at work and outside of work.

Shepherd, 168 F.3d at 872.  There, the Court of Appeals held that the co-worker's

comments were neither "frequent" nor "severe" enough to warrant Title VII relief.  Id. at

875.  Similarly, in Penry, two plaintiffs, Gillum and Penry, brought suit against

Waggoner, their co-worker and supervisor, alleging in part:

> that several times when she and Waggoner traveled together for FHLB
> business, he intentionally gave hotel clerks the impression that he and
> Gillum were to share a room, leaving it to Gillum to correct the situation.
> While [Plaintiff] Penry was on business travel with Waggoner in March
> 1990, he asked her if women have wet dreams. While Waggoner and
> Gillum were on a business trip together in April 1990, Waggoner took
> Gillum to dine at Hooters, a restaurant whose marketing theme is based
> on its well-endowed female waiting staff. Gillum was unaware of this
> feature of the restaurant until after they arrived. Later, Penry and Gillum
> learned from another woman in their department that Waggoner had also
> chosen that restaurant while on business travel with her. On another trip,
> Waggoner insisted that Gillum work in his hotel room despite her protests
> and request to work in her own room.
>
> During a business trip in October of 1990, Waggoner told Penry that her
> bra strap was showing but then said, according to Penry, that he kind of
> liked it that way. In March of 1991, Gillum overheard Waggoner make a
> double entendre to another male employee that one of the female
> assistants "allowed him to get in her drawers anytime." In November 1992,
> Waggoner asked Penry what she was wearing under her dress and laughed
> when she said she did not appreciate the comment. On separate occasions
> in 1990 and 1991, Waggoner pointed out to each of the plaintiffs that the
> roof of a particular mall was shaped like a woman's breasts. Penry alleges
> that in the fall of 1992, Waggoner began following her constantly when she
> got up to go to the breakroom or the bathroom. Gillum alleges that
> between spring of 1991 and spring 1992, Waggoner would often (at least
> twice a week) stand and stare at her while she was working. In December
> 1992, Waggoner called one of the other female review assistants over to
> where he and Penry and Gillum were gathered by demanding, "bring your
> buns over here." Gillum alleges that on one day in 1993, Waggoner leaned
> against her and repeatedly tried to look down her blouse. Waggoner
> repeatedly referred to the collateral assistants as "gals" rather than by
> name when introducing them to employees at other banks on travel,

despite their requests that he stop doing so. Both plaintiffs allege that
Waggoner needlessly touched them on many occasions throughout the
years they worked with him. Each complains that he would often sneak up
from behind and grab her shoulders while loudly saying her name to
startle her.

Penry, 155 F.3d at 1260-61.  In that case, the Court of Appeals, was "unable to conclude

that a rational jury could find that plaintiffs' workplace was permeated with

discriminatory intimidation." Id. at 1263.  Rather, the court noted that in light of the

entire record, the allegedly offensive conduct "seems motivated by poor taste and a lack

of professionalism rather than by the plaintiff's gender." Id.

Viewing the evidence as a whole, the conduct alleged by Sardina pales by

comparison to the conduct alleged in Shepherd and Penry.  And the Penry Court's

characterization of defendant's motivation applies to the evidence of the intent of

Sardina's co-workers presented in this case.  While it is arguable that some of the

comments made in Sardina's presence had sexual content and that she might reasonably

have taken offense at them, the incidents were episodic in nature, over a two-year

period, and could not objectively be deemed either severe or pervasive enough to have

effected a hostile work environment.  A plaintiff may not survive summary judgment on

the proffer of a series of minor, unconnected events and the baseless speculation that

there was a wide-ranging conspiracy to harass her.  In this case, Sardina has merely

documented the kind of incidental remarks and occurrences that inevitably transpire in

the common workplace.  Title VII is not aimed at policing such behavior.  To hold that

the evidence in this case gives rise to a triable issue of fact as to whether a reasonable

person would find the conduct alleged hostile or abusive requires a view of Title VII as a

workplace speech code and would render hollow the statement "that summary judgment

may be appropriate even in the fact-intensive context of discrimination cases."

Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d at 466.

**B.      Sardina has failed to show evidence of a constructive discharge.**

Sardina's allegation that she was constructively discharged from her job does not comport with the undisputed facts in this case.  It is undisputed that UPS investigated and took action upon every allegation of harassment and retaliation that she brought to the attention of her managers, and that in an effort to retain Sardina, they offered her an opportunity to either return to the Foster Avenue facility, or if that was undesirable to her, to transfer to a new work environment.  Moreover, Sardina does not dispute that she was forced to take disability leave, and has been unable to return to work, because of her medical and emotional condition.  There is simply no evidence of a deliberate attempt to create intolerable work conditions to compel Sardina to resign.  Moreover, Plaintiff's invocation of Mack v. Otis Elevator cuts against her argument that a constructive discharge occurred.  In that case, the Court of Appeals observed that where, as here, the plaintiff "simply refused the transfer and failed to return to work," no constructive discharge occurred.  Mack, 326 F.3d at 128.

**C.      Sardina has provided no basis for finding an adverse
          employment action or retaliatory harassment.**

Sardina contends that Schwartz's failure to honor her reduced work schedule and the harassment by her co-workers at the Canarsie center constituted adverse employment action, in retaliation for her complaints to Pace and Miller about sexual harassment.

Assuming that Schwartz and UPS failed to abide by the alleged agreement she

had with Pace–which Pace denies they ever had and of which Schwartz asserts he was

unaware–to allow her to return on a reduced schedule, the subsequent determination, if

it were made, that UPS needed her to work the hours she acknowledges were required

for her position cannot constitute adverse action.  An adverse employment action

constitutes a "significant change in employment status, such as hiring, firing, failing to

promote, reassignment with significantly different responsibilities, or a decision causing

a significant change in benefits."  Ellerth, 524 U.S. at 761, 118 S.Ct.  At worst, Sardina

alleges that Schwartz and UPS discontinued a special arrangement that was

conditionally granted to her "until [her] doctor O.K.'d the going back to full-time work,"

(Pl. Tr. 383), requiring her to fulfill the established requirements of her job.  A

subsequent finding that such gratuitous assistance of the sort UPS offered to Sardina

was no longer supportable by the company does not constitute adverse action.  And even

if the subsequent discontinuation of Sardina's alleged special privileges could constitute

adverse action, there is no evidence that such discontinuation was intended as

retaliation for her complaints to Pace or Miller.  To the contrary, Sardina knew of no

reason to think Schwartz was aware of her October 1998 complaint, (Pl. Tr. 112-114),

and she has provided only the barest of personal speculation by innuendo as to any

causal relationship between her complaints and the response of the Canarsie

personnel.[15]  There is no basis to infer that Sardina suffered any retaliatory action, either

---

[15] Emblematic of this speculation and innuendo was Sardina's response to the question "What facts cause you to come to the conclusion that all of these people [at the Canarsie center] were working together to patronize you?"  Sardina answered "Because I saw them do it to another clerk, was privy to that information when it was done to her, and watched them do it to her.  So I was totally aware of what was happening to me."  (Pl. Tr. 114).  And in response to the question "what makes you think that that treatment was motivated by a desire to retaliate against you because you made a complaint to Bruce Pace?" Sardina replied, "Well, ma'am, when a complaint of sexual harassment is placed and the person is shunned by their co-workers in any work environment, I don't have the answer as to why that is done to

adverse employment action from a failure to honor the temporary schedule allegedly

afforded her, or retaliatory harassment by her co-workers.

      **C.**      **UPS is entitled to the <u>Faragher/Ellerth</u> affirmative defense**.

      Finally, even if she had presented jury questions as to whether the Defendants'

conduct created a hostile work environment, constructively discharged her, or that she

suffered retaliation, the undisputed facts in this case demonstrate that Defendants

would be entitled to judgment as a matter of law based on the <u>Faragher/Ellerth</u>

affirmative defense: UPS exercised reasonable care to prevent and correct promptly any

sexually harassing behavior and Sardina unreasonably failed to take advantage of the

preventative or corrective opportunities provided to her.

      It is undisputed that UPS maintained and published to its employees policies that

not only prohibited sexual harassment, but protected individuals from retaliation for

reporting harassment and pledged to investigate and take action upon both anonymous

and attributed complaints.  And, in fact, UPS followed its procedures.  In response to

Sardina's complaints to Pace in October 1998 and Miller on March 17, 1999, the division

managers investigated the allegations and took action to prevent further harassment.

And when Sardina formally filed a formal complaint through her attorney in July 1999,

UPS initiated a comprehensive investigation under the direction of its Human

Resources department.  Even in response to her informal complaints to Scigowski about

comments which she found offensive, Plaintiff found a responsive supervisor.  Scigowski

ceased using the offensive language in her presence.  This Court concludes that UPS's

policies and practices were sufficient to satisfy the first prong of the <u>Faragher/Ellerth</u>

_____

people." (Pl. Tr. 118).

defense.

Moreover, it is undisputed that Sardina failed to avail herself of the multiple means of addressing any harassment she perceived at the Times Plaza center for eighteen months between April 1997 and October 1998, and then again at the Canarsie center between January 1999 and March 1999. Her contention that she failed to report inappropriate conduct because she feared retribution is unreasonable in light of the anonymous complaint hotline offered by UPS and the company's anti-retaliation policy.

Plaintiff contends that because she informally complained to Scigowski and confided in Burgess and McNamara, she properly availed herself of UPS's procedures for reporting sexual harassment. To the extent that she was concerned about Scigowski's behavior, however, Sardina unreasonably relied upon her complaints to him and had an obligation to report it either to his superiors, human resources, or anonymously through the UPS hotline. And it would be unreasonable to consider that Sardina's confidences to Burgess or McNamara were the equivalent of complaints. Sardina acknowledged that because of her secret and intimate nature of her relationship with Burgess she would have been surprised if he had taken any action based on her confidences. And at the time she confided in McNamara, in September 1998, he was no longer a UPS employee; he had left the company in February of that year. Thus, Sardina unreasonably failed to avail herself of preventative or corrective measures. UPS has met its burden of proving the Faragher/Ellerth affirmative defense based on the undisputed facts in the record. For that reason, Defendants are entitled to summary judgment on the Title VII hostile work environment claim and constructive discharge claims.

IV.     NYSHRL and NYCHRL Claims

Because "claims under the NYSHRL are analyzed identically to claims under the ADEA and Title VII, the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is under the ADEA and Title VII." <u>Smith v. Xerox Corp.</u>, 196 F.3d 358, 363 n.1 (citing <u>Leopold v. Baccarat, Inc.</u>, 174 F.3d 261, 264 n.1 (2d Cir.1999)). <u>See also</u> <u>Weinstock v. Columbia University</u>, 224 F.3d 33, 42 n.1 (2d Cir.2000) (noting "identical standards apply to employment discrimination claims brought under Title VII, Title IX, New York Executive Law § 296, and the Administrative Code of the City of New York.). Accordingly, the Court treats the federal, state and city claims together.

Though Title VII imposes no individual liability on supervisors or co-workers, <u>see</u> <u>Tomka v. Seiler Corp.</u>, 66 F.3d 1295, 1314 (2d Cir.1995), NYSHRL and NYCHRL provide a basis for individual liability in some circumstances. <u>See</u> <u>Feingold v. New York</u>, 366 F.3d 138, 156 (2d Cir.2004) (noting that NYSHRL and NYCHRL provide for individual aiding and abetting liability). However, because the Court finds that Plaintiff has failed to present a jury question on whether the conduct alleged created a hostile work environment, whether or not she was constructively discharged or retaliated against, the individual defendants are entitled to summary judgment on the NYCHRL and NYSHRL discrimination claims. Similarly, though the applicability of the <u>Faragher/Ellerth</u> affirmative defense has not yet been clearly established for employers under NYSHRL and NYCHRL, <u>see</u> <u>Forrest v. Jewish Guild for the Blind</u>, 3 N.Y.3d 295, 312, 819 N.E.2d 998, 786 N.Y.S.2d 382 (N.Y.2004), the absence of any triable issue of fact entitles UPS to summary judgment on the state and city law claims.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED.  The Clerk of the Court is respectfully directed to close the case, Plaintiff to take nothing.

SO ORDERED.

Dated:      Brooklyn, New York
           June 27, 2006.

_____/s/_____

I. Leo Glasser
United States Senior District Judge

Copies of the foregoing memorandum and order were electronically sent to:

<u>Counsel for the Plaintiff</u>

Saul D. Zabell
Zabell & Associates, P.C.
Email: SZabell@laborlawsny.com

<u>Counsel for the Defendant</u>

Kathleen Mary McKenna
Proskauer Rose, LLP
Email: kmckenna@proskauer.com